IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DIXIE CONSUMER PRODUCTS LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> HUHTAMAKI AMERICAS, INC., et al, ) <br> ) <br> Defendants. ) | CIVIL ACTION FILE <br><br> NUMBER 1:08-cv-3125-TCB |

# **O R D E R**

This matter is before the Court on Defendants Huhtamaki Americas, Inc., Huhtamaki Company Manufacturing, Huhtamaki Packaging, Inc., Huhtamaki Consumer Packaging, Inc., and Huhtamaki Foodservice, Inc.'s (collectively "Huhtamaki") motion for summary judgment [39]. After an exhaustive review of the parties' briefs, the record evidence, and the arguments made by counsel during the February 26, 2010 summary judgment hearing, the Court rules as follows.

I.   **Background**

Plaintiff Dixie Consumer Products LLC ("Dixie") and Huhtamaki are competitors in the disposable tableware and foodservice market. Both companies manufacture and sell a variety of disposable products, including insulated cups, bowls and napkins. The present dispute arises primarily from Dixie's contention that Huhtamaki manufactures and sells a cup known as the Chinet Comfort Cup that infringes on the alleged trade dress rights that Dixie possesses with respect to its Insulair Cup.[1]

In 1997, Dixie introduced the version of the Insulair Cup that is at issue in this litigation. The cup is comprised of three layers: (1) an inner cup layer; (2) a middle insulating layer; and (3) a paper outer layer. The inner layer is a traditional paper cup; it includes an inner bottom that holds liquid within the side walls. The walls of the inner cup extend beyond the inner bottom to create an indented base. The middle layer, or the insulating layer, is made of corrugated paper and wraps around a portion of the middle of the cup where the liquid is contained. The insulating layer

---

[1] Dixie also asserts a traditional trademark infringement claim against Huhtamaki based upon its alleged display of Dixie's petal design on its website. Huhtamaki has not yet moved for summary judgment on this claim and therefore the Court may not rule upon it at this time. Nevertheless, the Court observes that at least at this stage of the litigation, it is skeptical of the strength of any claim that Dixie may seek to assert based upon the petal design, particularly because Huhtamaki has represented that (1) it has removed from its website all photographs of the allegedly infringing petal design, and (2) the photographs that were on Huhtamaki's website did not appear in conjunction with the promotion of any particular product.

helps keep the liquid warm and protect the user's hands.  The third, or outer, layer fastens on top of the insulating layer and extends slightly above and below the insulating layer.  The outer layer is made of thin paper that is capable of displaying print or graphics for advertising.

Dixie contends that it is the positioning/orientation of these layers on the Insulair Cup that creates the alleged trade dress.  Specifically, Dixie seeks trade dress protection in the narrow white band at the bottom portion of the Insulair cup that is created due to the positioning of the outer layer and the insulating layer vis-à-vis the inner cup layer.  Stated another way, Dixie claims trade dress protection in the bottom white portion of the Insulair Cup.  The following picture of Dixie's Insulair Cup illustrates the alleged trade dress at issue:



In 2008, Huhtamaki began selling its competing Comfort Cup.  Since its introduction, the Comfort Cup has captured a growing share of the market for insulated hot cups.  Although Dixie and Huhtamaki utilize

different manufacturing methods, both the Insulair Cup and the Comfort Cup are comprised of three layers that are positioned in a similar way. Consequently, like Dixie's Insulair Cup, the bottom portion of Huhtamaki's Comfort Cup also has a narrow white band.  The following picture shows the white band on Huhtamaki's Comfort Cup:



On October 6, 2008, Dixie filed this action, in which it asserts that the narrow white band on the bottom portion of its Insulair Cup constitutes a protectable trade dress that is being infringed upon by Huhtamaki's Comfort Cup.

On July 13, 2009, Huhtamaki filed a motion for summary judgment on Dixie's trade dress infringement claim, raising one key argument: the element of the cup for which Dixie seeks trade dress protection is functional, and under well settled law, there can be no trade dress protection for design elements that serve a functional purpose.  *See TrafFix*

*Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001); *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995).

II. **Discussion**

    A. **Summary Judgment Standard**

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The nonmovant is then required to "go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions, and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Resolving all doubts in favor

of the nonmoving party, the Court must determine "whether a fair-minded jury could return a verdict for the [nonmoving party] upon the evidence presented." *Id.*

## B. Analysis

### 1. Burden of Proof

Although this case is before the Court on Huhtamaki's motion for summary judgment, both parties recognize that Dixie has the burden of proof with respect to the issue of functionality. Dixie must shoulder this burden because the alleged trade dress at issue is not registered on the principal register.[2] *See* 15 U.S.C. § 1125(a)(3) ("In a civil action for trade dress infringement . . . for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."). As the

---

[2] Although Dixie's alleged trade dress is not registered on the principal register, the parties have submitted various briefs in connection with the fact that on February 16, 2010, the United States Patent and Trademark Office ("USPTO") approved the mark for publication in the Official Gazette for opposition. Although the parties agree that this fact has no impact on the burden of proof issue, Dixie nevertheless contends that the Court should give deference to the USPTO's registration decision because in reaching that decision the USPTO considered and rejected arguments advanced by Huhtamaki concerning the functionality of the trade dress.

There is no binding authority that requires the Court to give any deference to the USPTO's findings. Without any substantive reasoning issued by the USPTO as to why it rejected the arguments made by Huhtamaki, the Court affords no weight to the USPTO's registration decision. *Accord Trimark USA, Inc. v. Performance Food Group Co.*, Civil Action No. 09-11222-JGD, 2009 U.S. Dist. LEXIS 101529, at *23-24 (D. Mass. Oct. 21, 2009) ("the fact that the PTO approved publication of the mark for opposition is entitled to 'no weight.'").

Supreme Court has explained, "this burden of proof gives force to the well-established rule that trade dress protection may not be claimed for product features that are functional." *TrafFix*, 532 U.S. at 29.

Accordingly, in weighing the parties' arguments, the Court is mindful that Dixie has the burden of proving that the narrow white band for which it seeks protection is a nonfunctional feature of the cup.

### 2. Functionality

#### 1. Overview

Section 43(a) of the Lanham Act creates a federal cause of action for trade dress infringement. 15 U.S.C. § 1125(a)(1); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1986). "The term 'trade dress' refers to the appearance of a product when that appearance is used to identify the producer." *Publ'ns Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 338 (7th Cir. 1998). As previously noted, to prevail on its claim for trade dress infringement, Dixie must as a threshold matter prove that the feature in question is nonfunctional. *See Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1039 (11th Cir. 1996).

"The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead

inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex*, 514 U.S. at 164. Indeed, the Supreme Court has cautioned against the overextension of trade dress, noting that "product design almost invariably serves purposes other than source identification." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 213 (2000).

"Functional features of a product are features which constitute the actual benefit that the consumers wish to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1012 (9th Cir. 1999) (citations omitted). Additionally, "[f]unctional features are by definition those likely to be shared by different producers of the same product and therefore are unlikely to identify a particular producer." *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1203 (11th Cir. 2004) (quoting *Landoll, Inc.*, 164 F.3d at 340). "[T]hese features cannot be appropriated; otherwise, competitors would be prevented from duplicating the new product even to the extent permitted by the branches of the law of intellectual property that protect innovation rather than designations of source." *Id.*

### 2. *TrafFix* **and Patents**

Both parties recognize that the Supreme Court's *TrafFix* decision is the seminal case on the functionality doctrine. There, the Court confronted the issue of what effect the existence of a utility patent has on a claim of trade dress infringement. The Court held as follows:

> A prior patent, we conclude, has vital significance in resolving the trade dress claim. A utility patent is strong evidence that the features therein claimed are functional. If trade dress protection is sought for those features the strong evidence of functionality based on the previous patent adds great weight to the statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection.

532 U.S. at 29. Thus, under *TrafFix*, the disclosure of the feature in question in the claims of a utility patent constitutes compelling evidence that the feature in question is functional. *Id.* at 33.

Relying upon *TrafFix*, Huhtamaki points out that Dixie's Insulair Cup is the subject of several utility patents, including United States Patent Nos. 6,085,970 ("the '970 patent"), 6,196,454 ("the '454 patent"), 6,422,456 ("the '456 patent"), and 6,378,766 ("the '766 patent"). These patents claim an insulating cup or container and a method of manufacturing it. Huhtamaki emphasizes that the figures shown in the patents clearly depict an insulating sheet that is wrapped around the exterior of the cup which

does not extend all of the way to the bottom of the cup, thereby exposing a narrow band at the cup's base.

Moreover, the '970 patent, upon which Huhtamaki principally relies, touts the functional benefits of the Insulair Cup.  For example, the '970 patent states that the "insulating sheet does not cover the entire vertical length of the cup sidewall as shown in FIG.1 . . . [T]his is an advantage because it saves paper without significantly affecting the insulating performance of the cup."

Dixie counters that the term "insulating sheet" discussed in the '970 patent refers to the middle insulating layer, not the outer layer, and therefore the patent does not claim any functional benefit with respect to the trade dress at issue (i.e., the visible band at the base of the cup that is created by the positioning of the *outer layer*).  Dixie therefore contends that nothing in the '970 patent states that the outer layer cannot be extended to the bottom of the cup without impacting the functionality or insulation of the cup.  Thus, Dixie maintains that the feature for which it seeks protection is merely an "ornamental, incidental, or arbitrary aspect of the device," which under *TrafFix* would not be functional.  *See TrafFix*, 532

U.S. at 30 (a feature is not functional if it is ornamental, incidental, or arbitrary).

Dixie is partially correct—the statement in the '970 patent that the "insulating sheet does not cover the entire vertical length of the cup . . ." does indeed refer to the middle insulating layer as opposed to the entire insulating sleeve (the middle and outer layers together). However, the Court finds it compelling that the patent drawings depict that the *entire insulating sleeve* stops within millimeters of where the liquid stops. Thus, the patent goes further than just teaching that one can save materials and costs by not extending the middle layer to the bottom of the cup. It also impliedly teaches that one can save costs by not extending the outer layer to the bottom of the cup. In other words, the patent drawings illustrate that the middle and outer layers work together in unison.

Moreover, the Court is not persuaded by Dixie's argument that the alleged trade dress is merely an ornamental or arbitrary feature. Classic examples of an ornamental or arbitrary product feature include the Mercedes hood ornament and the four linked rings on Audi's grille. *See Eco Mfg. LLC v. Honeywell Int'l, Inc.*, 357 F.3d 649, 653 (7th Cir. 2003). Unlike these examples, the alleged trade dress at issue here is not an

ornamental feature added to the cup; it is the direct result of attaching a functional insulating sleeve to a functional single wall cup.

As the patents illustrate, Dixie's Insulair Cup is made up of a cup, the entirety of which is functional, and an attached insulating sleeve, the entirety of which is functional. Nonetheless, Dixie argues that combining these functional pieces together results in a nonfunctional design feature. In short, Dixie's trade dress theory is along the lines of the following mathematical equation: function + function = nonfunctionality. Not only does Dixie's argument defy logic, such an argument was rejected by the Ninth Circuit. *See Leatherman*, 199 F.3d at 1013 (a trade dress must be viewed as a whole, but where the whole is nothing other than the assemblage of functional parts and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate overall appearance which is nonfunctional).

After careful review, the Court therefore finds that Dixie's utility patents, and specifically the '970 patent, cover the product feature at issue, albeit impliedly. Based upon *TrafFix*, this finding would be sufficient alone to compel the entry of summary judgment in favor of Huhtamaki. *See*

*TrafFix*, 532 U.S. at 32-33. Moreover, even if the alleged trade dress at issue were not within the ambit of the patents, the Court finds that it is functional for other reasons.

### 3. Alternative Non-Infringing Cup Designs

Dixie devotes the bulk of its initial brief in opposition to Huhtamaki's motion for summary judgment to the argument that Huhtamaki could have selected numerous alternative non-infringing cup designs.[3] Interestingly, after *TrafFix*, there is some question as to whether alternative designs remain relevant in the functionality inquiry. *See TrafFix*, 532 U.S. at 33-34 ("There is no need . . . to engage . . . in speculation about other design possibilities . . . ."). At least one circuit has interpreted this language in *TrafFix* to mean that alternative designs are irrelevant to the functionality inquiry. *See Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 357 (5th Cir. 2002).

Other courts have read *TrafFix* more narrowly, reasoning that the Supreme Court did not categorically bar the consideration of alternative

---

[3] Dixie also emphasizes the substantial amount of money that it has spent to advertise and market the Insulair Cup. However, Dixie's efforts to promote the product are irrelevant to the issue of functionality. *See TrafFix*, 532 U.S. at 34-35 ("The Lanham Act, furthermore, does not protect trade dress in a functional design simply because an investment has been made to encourage the public to associate a particular functional feature with a single manufacturer or seller.").

13

designs as part of the overall evidentiary mix on the issue of functionality. *See Talking Rain Beverage Co. v. S. Beach Beverage Co.*, 349 F.3d 601 (9th Cir. 2003); *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268 (Fed. Cir. 2002); *see also* J. THOMAS MCCARTHY, MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 7:75 (4th ed. 2010) (the observations of the Supreme Court in *TrafFix* do not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine in the first instance if a particular feature is in fact "functional").

Although a consideration of alternative designs may not be appropriate in all trade dress cases, in light of the fact that the Eleventh Circuit has not yet spoken on the issue, the Court will address the alternative designs that Dixie proposes.

In doing so, it must be kept in mind that two tests exist for determining functionality. Under the first test, commonly referred to as the traditional test, a product feature is functional if it is "essential to the use or purpose of the article, or if it affects the cost or quality of the article." *TrafFix*, 532 U.S. at 32. Under the second test, which is commonly called the competitive test and generally applied in cases of aesthetic functionality, "a functional feature is one the exclusive use of [which] would

put competitors at a significant non-reputation-related disadvantage. *Id.* (quoting *Qualitex*, 514 U.S. at 165). Where the design is functional under the traditional test, "there is no need to proceed further to consider if there is a competitive necessity for the feature." *Id.* at 33.

Huhtamaki relies principally upon the second portion of the traditional test: a feature is functional if it "affects the cost or quality of the article." According to Huhtamaki, all of the alternative designs proposed by Dixie would either cost Huhtamaki more money to manufacture or would negatively impact the quality of the Comfort Cup.

The Court agrees with Huhtamaki. For example, one alternative design proposed by Dixie is that Huhtamaki could extend the size of the outer layer so that it covers the narrow white band at the base of the cup for which Dixie seeks trade dress protection. However, Dixie conceded at the February 26, 2010 hearing that such a design would be more expensive for Huhtamaki to manufacture because more paper would have to be used. Huhtamaki explains that in light of the relatively small profit margin on each cup, the cost of the additional paper that would be needed to expand the outer layer is significant (ranging from a cost increase of 2.5 percent for a 20-ounce cup to 3.6 percent for a 12-ounce cup). Indeed, as two of Dixie's

expert witnesses confirmed, even minimal cost savings in the range of only tenths of a penny are significant in the context of competitive pricing for paper cups.[4]

Next, Dixie argues that Huhtamaki could shorten the length of both the outer layer and the middle insulating layer. Such an alternative design would increase the visible portion of the interior cup showing at the cup's base, thereby alleviating Dixie's trade dress concerns. According to Dixie, this design is akin to the popular "java jacket" that is used by Starbucks and other coffeehouses. Dixie also maintains that this alternative design would be less expensive for Huhtamaki to manufacture because less paper would be needed.

Although it may be true that Huhtamaki could realize a cost savings from this design, the quality of the overall cup design would suffer. In particular, if the middle and outer layers were shortened, thus increasing the visible portion of the interior cup showing at the bottom, the cup may be less effective in keeping the liquid hot and protecting the user's hands.

---

[4] Furthermore, because additional paper resources would need to be used, environmental concerns cut against the argument that Huhtamaki should be required to expand the outer layer. Dixie maintains that Huhtamaki should be barred from making any environmental-based arguments in light of the fact that the middle layer on the Comfort Cup is made of foam, a material not known for its environmental friendliness. The Court rejects the notion that just because one aspect of Huhtamaki's cup may not be environmentally friendly, Huhtamaki is categorically barred from attempting to be environmentally conscious in other aspects of its cup design.

Perhaps even more important, such a design would cause Huhtamaki to lose valuable space for print advertising, which is a key market driver in the commercial market for these types of cups. Accordingly, the Court rejects Dixie's argument that this alternative design could be implemented without negatively impacting the quality of the cup. *Accord* McCarthy § 7:75 ("To be probative of nonfunctionality, alternative designs must be practical, feasible and effective . . . [a]lternative designs that have 'glaring functional flaws' are not evidence of nonfunctionality."); *Vornado Air Circulation Sys., Inc. v. Duracraft Corp.*, 58 F.3d 1498, 1507 (10th Cir. 1995) (alternative designs must be equally competitive alternatives).

For its final alternative design suggestion, Dixie contends that Huhtamaki could "shift" the outer layer and middle layers down on the cup, thereby covering the bottom white band at the base of the cup. According to Dixie, because the base of the cup is narrower than the middle of the cup, such an alternative design would require less paper and would be less expensive. However, like the previous design proposed by Dixie, this one would also negatively impact the quality of the cup. Specifically, the amount of insulation in the portion of the cup containing the liquid would

be reduced if the middle and outer layers were shifted down.[5] In both Huhtamaki's Comfort Cup and Dixie's Insulair Cup, the outer layer and middle layers stop at approximately the same point where the liquid does (instead of extending all the way to the bottom of the cup) because there is no need to insulate the cup beyond that point.[6]

Because Huhtamaki would either incur additional costs or sacrifice design quality if it were forced to adopt one of Dixie's alternative designs, the Court finds that the product feature in question is functional under the traditional test.[7]

In sum, the Court finds that the length/positioning of the middle and outer layers (which work together as the insulating sleeve) on both the

---

[5] Additionally, the bottom white band at the base of the cup may also provide a visual cue to consumers that the cup is insulated, yet another factor cutting in favor of a finding of functionality.

[6] During the summary judgment oral argument, Dixie attempted to undercut this argument by playing a portion of a video recording from the July 22, 2009 deposition of Huhtamaki's 30(b)(6) designee, Ronald Dean Robertson. In that clip, Robertson first claimed that the Comfort Cup incorporated uninsulated white space at the bottom of the cup because consumers do not touch that portion of the cup when holding it. However, moments later, Robertson unwittingly picked up a Comfort Cup on the table, and in doing so, touched the uninsulated white space at the bottom of the cup. In other words, Robertson's conduct apparently contradicted his words. Although Dixie's argument is a creative one, the Court attaches little significance to Robertson's misstep because it is undisputed that the cup that he was holding did not contain any liquid, and Robertson was holding the cup at a tilt because it was empty.

[7] Because the alleged trade dress is functional under the traditional test, there is no need to consider the competitive necessity test. *See TrafFix*, 532 U.S. at 33. However, even under the competitive necessity test, the product feature could be deemed functional because for the reasons already discussed, all of the alternative designs proposed by Dixie would cause Huhtamaki to suffer a significant non-reputation related competitive disadvantage. *See Dippin' Dots*, 369 F.3d at 1204 n.7.

Insulair Cup and the Comfort Cup strike the most favorable balance among minimum manufacturing costs and materials, maximum insulation and holdability, and the optimal amount of surface space for print advertising. As a result, it is not surprising that during the summary judgment oral argument, Huhtamaki identified several other examples of insulated cups on the market that have a bottom white band below an insulating sleeve.

If Dixie were allowed to exclusively manufacture insulated cups with a band of the interior cup showing beneath the insulating sleeve, it would stifle competition in the market for insulated cups, which is exactly what the functionality doctrine seeks to prevent. If such facts are true, Dixie is free to tout to commercial purchasers that its cups are better because they are made of higher quality materials and are more environmentally friendly. Dixie has failed to show, however, that the law of trade dress affords it exclusive ownership of the narrow white band at the base of the Insulair Cup.[8]

---

[8] Finally, although not legally dispositive, the Court finds it telling that Dixie owns numerous patents pertaining to the Insulair Cup and is also the owner of over 128 active trademark registrations. Given Dixie's considerable experience in protecting its intellectual property, it strikes the Court as peculiar that Dixie waited until the day it filed this lawsuit to seek registration of the alleged trade dress at issue. If Dixie has long held a belief that the bottom portion of its cup was a protectable trade dress (as it has represented in this litigation), it is odd that Dixie did not attempt to register the trade dress long before filing this action.

For all of these reasons, the Court finds that Dixie has failed to carry its burden of proving that the alleged trade dress at issue is nonfunctional.[9]

## III. **Conclusion**

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment [39].[10]

IT IS SO ORDERED this 8th day of March, 2010.

_____
Timothy C. Batten, Sr.
United States District Judge

---

[9] In its opening summary judgment brief, Huhtamaki requested that the Court award its attorney's fees pursuant to section 35(a) of the Lanham Act. *See* 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party."). In Huhtamaki's reply brief, it explained, however, that it would not be seeking attorney's fees until completion of the case. The Court therefore declines at this time to consider whether to award any attorney's fees in connection with the motion for summary judgment.

[10] In light of the Court's ruling on Huhtamaki's motion for summary judgment, it appears that two other motions that are currently pending on the docket—Dixie's motion to disqualify Dr. Eli Seggev [94] and Huhtamaki's motion for leave to file an amended answer [68]—may now be moot. If these other motions are indeed moot, the Court asks that the parties promptly withdraw them.